| | | |
|---|---|---|
| STEVEN GROHS, | : | |
| | : | |
| Plaintiff, | : | Civ. No. 16-7083 (KM) (JBC) |
| | : | |
| v. | : | |
| | : | |
| GARY M. LANIGAN et al., | : | **OPINION** |
| | : | |
| Defendants. | : | |
| | : | |

**KEVIN MCNULTY, U.S.D.J.**

## I.      INTRODUCTION

The plaintiff, Steven Grohs, is committed under the New Jersey Sexually Violent Predator Act at the Special Treatment Unit ("STU"), in Avenel, New Jersey. He is proceeding pro se with a civil rights complaint. This Court previously granted Mr. Grohs leave to proceed *in forma pauperis*. (ECF No. 3.)

This Court must now screen the complaint, under 28 U.S.C. § 1915(e)(2)(B), to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from suit. For the following reasons, portions of the complaint will be dismissed without prejudice for failure to state a claim, and the remainder of the complaint will be permitted to proceed.

## II.      BACKGROUND

The complaint lists as defendants, in their individual capacities, Gary M. Lanigan, commissioner of the New Jersey Department of Corrections ("NJDOC"), Sherry Yates, administrator of the STU, Major Colm D. Foley, institutional search plan coordinator for the

STU, Sgt. Rivera, SCO Lee, SCO Calton, and John Doe, each of whom are corrections officers employed at the STU, SCO Lukaszewski, the STU mailroom officer, and Jane Doe, an NJDOC ombudsman. (DE 1, ¶¶ 5–34.) Mr. Grohs's complaint concerns two distinct incidents, one in October 2015 and one in June 2016.

## A. October 2015

Mr. Grohs alleges that, on October 16, 2015, Mailroom Officer Lukaszewski left a food package addressed to Mr. Grohs outside of his cell during lockdown. Grohs was not expecting the package and did not want to accept it.[1] (*Id.* ¶ 36–39.) Accordingly, Lukaszewski returned the package to the sender. (*Id.* ¶¶ 40–41.)

Just after midnight on October 27, 2015, Officers Lee and Calton placed Mr. Grohs into Temporary Close Custody ("TCC")[2] in a cell on the unit's third tier. (*Id.* ¶¶ 42–43.) Mr. Grohs contends that, due to a malfunctioning heating unit, the third tier was excessively hot, with temperatures exceeding 107 degrees. (*Id.* ¶¶ 44–45.) He alleges that, upon his admission to TCC, Lee and Calton subjected him to a strip search, forcing him to completely disrobe and remain nude for five minutes in an area visible to other STU residents. (*Id.* ¶¶ 46–50.)

Mr. Grohs contends that the TCC cell was filthy, with fecal matter smeared on the toilet, floor, and bunk, and was infested with bedbugs. (*Id.* ¶¶ 55–58.) He alleges that water from the cell sink was discolored and hot and that his request for cool water was ignored. (*Id.* ¶¶ 56, 59.)

---

[1]     Mr. Grohs explains that, as the STU permits residents to receive only two food packages per month, he worried that accepting this package would have prevented his receiving another food package that he was expecting. (DE 1 ¶ 39.)

[2]     Temporary Close Custody entails "the removal of a resident from the general population, or other assigned status, with restriction to a room in a designated area for a period not to exceed 72 hours." N.J. Admin. Code § 10A:35-1.4.

2

He recounts that, when a leaking pipe began to flood the cell, he was moved to a different, but equally unpleasant, cell on the third tier. (*Id.* ¶¶ 60–63.)

Meanwhile, Mr. Grohs explains, he learned that, on October 27, 2015, two other STU residents had received food packages containing contraband tobacco and that he had been placed in TCC because STU officers believed that the package he had rejected on October 16 also contained contraband. (*Id.* ¶¶ 66–67.) Mr. Grohs indicates that, after explaining that he had rejected the package as undesired, he was released from TCC and returned to his normal cell at about 3:30 p.m. on October 28, 2015. (*Id.* ¶¶ 67–69, 71.)

Mr. Grohs alleges in Count I that Administrator Yates placed him in TCC as retaliation for prior lawsuits against her, and that the delivery of the unexpected food package and allegations of receiving contraband were merely pretextual justifications. (*Id.* ¶¶ 93–112.) Accordingly, he alleges that "Yates and Lukaszewski have violated Plaintiff's First Amendment rights to be free from retaliation when Defendant Yates arbitrarily used insufficient information from Defendant Lukaszewski to place Plaintiff in TCC." (*Id.* ¶ 111.)

Mr. Grohs also alleges, in Count II, that the October 27, 2015, strip search violated his Fourth Amendment right to be free from unreasonable searches. (*Id.* ¶¶ 113–127.) He argues that STU policy permits strip searches only with probable cause to believe that a resident is hiding a weapon or dangerous object and that non-invasive, electronic scans are also provided for. (*Id.* ¶¶ 114–120.) Accordingly, he alleges that Sergeant Rivera, Officer Lee, and Officer Calton violated his Fourth Amendment rights by conducting the search, and that Administrator Yates and Search Plan Coordinator Foley should bear supervisory liability, as they should have known officers were routinely performing strip searches without probable cause. (*Id.* ¶¶ 119–127.)

In Count VI, asserted only against Administrator Yates, Mr. Grohs alleges that the conditions of his TCC detention, specifically the excessive heat, filth, and lack of potable water, amounted to cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments. (*Id.* ¶¶ 165–173.) He alleges that Yates knew of these conditions, but "took no reasonable actions to minimize or timely resolve these problems." (*Id.* ¶ 170.) He adds that temperatures exceeded 109 degrees and that existing exhaust fans were not run. (*Id.* ¶ 171.)

## B. June 2016

Mr. Grohs alleges that, during a "stand-up count" on June 9, 2016, Officer John Doe ordered him to remove all his clothes for a strip search. (*Id.* ¶¶ 72–79.) Mr. Grohs explains that he asked John Doe if probable cause existed for the search and John Doe responded by slapping him in the face and ordering him to comply. (*Id.* ¶¶ 77–78.) Mr. Grohs alleges that, during the search, John Doe, in response to an incident involving an STU resident several cells away, suddenly yelled at Mr. Grohs to get down on the floor and simultaneously shoved him to the ground, causing his face to strike the concrete floor. (*Id.* ¶¶ 80–85.) Mr. Grohs alleges that this incident subsequently caused a cyst to develop on his left cheek. (*Id.* ¶¶ 85–86.) He recounts that the strip search subsequently continued, involving inspection of his genitals and rectum, ultimately lasting about 45 minutes. (*Id.* ¶¶ 87–90.) Mr. Grohs alleges that Commissioner Lanigan, Ombudsman Jane Doe, and Search Plan Coordinator Foley were present in the housing unit during this incident and "were cognizant of the actions of Defendant John Doe, as all other SOG officers were acting in a similar way with other residents." (*Id.* ¶¶ 92, 137.)

Mr. Grohs, in Count III, alleges that the June 9, 2016, strip search was improper and violated his Fourth Amendment rights. (*Id.* ¶¶ 128–141.) He argues that no probable cause existed to believe he was concealing contraband, that no contraband was found, and that John

4

Doe was unjustified in ordering him to "repeatedly touch his genital areas." (*Id.* ¶¶ 131–132.) He argues that John Doe clearly did not distinguish between inmates serving criminal sentences and persons like Mr. Grohs, who are subject to civil commitment, that the search violated provisions of the New Jersey Administrative Code requiring that STU resident searches "be conducted in a professional and dignified manner, with maximum courtesy and respect for the resident's person, and under sanitary conditions," and that Lanigan, Foley, and Jane Doe did nothing to correct him. (*Id.* ¶¶ 133–139.)

In Count IV, Mr. Grohs alleges that John Doe employed excessive force when he slapped Mr. Grohs and subsequently shoved his face into the floor. (*Id.* ¶¶ 142–149.) Mr. Grohs urges that he obeyed all commands by John Doe and other officers and that John Doe could simply have ordered him to lie down on the floor without pushing him down. (*Id.* ¶¶ 145–147.)

### C. General Claims

More broadly, Mr. Grohs asserts, in Count V, that all defendants other than Lukaszewski abused their power and violated Mr. Grohs's due-process rights by treating him as if he were serving a criminal sentence, when he is merely committed under the New Jersey Sexually Violent Predator Act. (*Id.* ¶¶ 150–164.) Mr. Grohs urges that, under that act, defendants had a duty to treat him better than a prisoner serving a criminal sentence and that they "wantonly ignored their duty and they were deliberately indifferent to the nonpunitive purpose for which Plaintiff is committed." (*Id.* ¶¶ 157–160.)

In Count VII, Mr. Grohs alleges that Lanigan, Yates, Foley, Rivera, Jane Doe, and John Doe violated the Eighth Amendment prohibition on cruel and unusual punishment by performing and permitting both the October 2015 and June 2016 strip searches. (*Id.* ¶¶ 174–178.) Mr. Grohs

claims that the conduct by those defendants amounted to deliberate indifference to his health or safety. (*Id.* ¶ 176.)

Mr. Grohs further alleges, in Count VIII, that Lanigan, Yates, Foley, and Jane Doe are liable for his rights violations under a theory of supervisory liability. (*Id.* ¶¶ 179–189.) Specifically, he asserts that "Lanigan, Yates, and Foley were aware that residents were being subjected to unreasonable strip searches and these Defendants were indifferent to real or perceived constitutional violations." (*Id.* ¶ 186.) He reiterates that Lanigan, Foley, and Jane Doe were present for the June 2016 strip search, but "took no action to prevent Defendant John Doe from conducting a strip search that was inconsistent with the STU's search plan." (*Id.* ¶ 187.)

Finally, in Count IX, Mr. Grohs alleges that Rivera and John Doe violated his right to privacy under the New Jersey Constitution. (*Id.* ¶¶ 190–197.) He contends that STU residents still have an expectation of privacy and a right to be free from "wrongful intrusion" into their lives. (*Id.* ¶¶ 191–192.) Accordingly, he argues that their strip searches of him, without probable cause, were unreasonable and violated this right. (*Id.* ¶¶ 195–196.)

The complaint seeks declarations that defendants have violated Mr. Grohs's rights and compensatory damages. (*Id.* at pp. 44–47.)

### III. LEGAL STANDARDS

Under the Prison Litigation Reform Act, Pub. L. 104-134, §§ 801–810, 110 Stat. 1321-66 to 1321-77 (Apr. 26, 1996) ("PLRA"), district courts must review complaints when the plaintiff is proceeding *in forma pauperis*. *See* 28 U.S.C. § 1915(e)(2)(B). The PLRA directs district courts to sua sponte dismiss claims that are frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. *Id.*

"The legal standard for dismissing a complaint for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) is the same as that for dismissing a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Schreane v. Seana*, 506 F. App'x 120, 122 (3d Cir. 2012). Under Federal Rule of Civil Procedure 8, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has explained that, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 n.3 (3d Cir. 2014). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Pro se pleadings, as always, will be liberally construed. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972); *Glunk v. Noone*, 689 F. App'x 137, 139 (3d Cir. 2017). Nevertheless, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

A plaintiff may have a cause of action under 42 U.S.C. § 1983 for certain violations of his constitutional rights. That section provides,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

> injured in an action at law, suit in equity, or other proper
> proceeding for redress, except that in any action brought against a
> judicial officer for an act or omission taken in such officer's
> judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was
> unavailable.

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege, first, the violation of a

right secured by the Constitution or laws of the United States, and second, that the alleged

deprivation was committed or caused by a person acting under color of state law. *See Harvey v.*

*Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011); *see also West v. Atkins*, 487 U.S. 42,

48 (1988).

## IV. DISCUSSION

### a. Retaliation Claim

A plaintiff pleads a claim for retaliation by alleging that "(1) he engaged in

constitutionally protected conduct[,] (2) he suffered an adverse action[,] and (3) the

constitutionally protected conduct was a substantial or motivating factor for the adverse action."

*Brant v. Varano*, 717 F. App'x 146, 149 (3d Cir. 2017); *see also Rauser v. Horn*, 241 F.3d 330,

333–34 (3d Cir. 2001). "'[G]overnment actions, which standing alone do not violate the

Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire

to punish an individual for exercise of a constitutional right.'" *Allah v. Seiverling*, 229 F.3d 220,

224–25 (3d Cir. 2000) (alteration in original) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 386

(6th Cir. 1999)); *see also Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003). It is well

established that the filing of lawsuits or grievances constitutes conduct protected by the First

Amendment. *See Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002); *see also Martin v.*

*Gearhart*, 712 F. App'x 179, 187 (3d Cir. 2017); *Nifas v. Coleman*, 528 F. App'x 132, 134 (3d

Cir. 2013). An adverse action is one "sufficient to deter a person of ordinary firmness from

exercising his constitutional rights." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 297 (3d Cir. 2016); *see also Watson v. Rozum*, 834 F.3d 417, 422 n.6 (3d Cir. 2016); *Mitchell*, 318 F.3d at 530. Whether the action in question meets this standard "is an objective inquiry and ultimately a question of fact." *Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012); *see also Allah*, 229 F.3d at 225.

If there is protected conduct and an adverse action, the question becomes whether there is a causal link between the two. *See Rauser*, 241 F.3d at 333. At that stage, the plaintiff first bears the burden to show that the protected conduct was a "substantial or motivating factor" underlying the adverse action, and the burden then shifts to the defendant to show that it would have taken the same action regardless of the plaintiff's protected conduct. *Id; see also Watson*, 834 F.3d at 422. Where a causal link cannot be shown with direct evidence, a plaintiff may try to satisfy the initial burden by demonstrating "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Watson*, 834 F.3d at 422.

Mr. Grohs alleges that his October 2015 placement in TCC was retaliation for lawsuits he had previously filed against Administrator Yates and because Mr. Grohs tended to "frequently assert[] his fundamental rights for the purpose of re[]dressing governmental actions." (*See* DE 1 ¶¶ 93–112.) There is no question that Grohs's filing of the prior lawsuits against Yates constituted conduct protected under the First Amendment. Placement in TCC appears sufficiently severe to constitute an adverse action, particularly in light of the allegedly deplorable condition of the third-tier cell(s). The ostensible justification for placing Mr. Grohs was the pending charge of receiving (or attempting to receive) contraband. Grohs alleges factually however, that circumstances exist to suggest that that basis was pretextual. His package, he

states, arrived more than a week before the packages for other residents that contained contraband; there was no evidence that he was expecting or even wanted his package; and the contraband in the packages to other residents was readily discovered by scans in the mail room, suggesting that if Mr. Grohs's package was comparable, it should likewise have been intercepted. (*See* DE 1 ¶¶ 96–104.) Of course, we do not yet have the authorities' side of the story. At this preliminary screening stage, however, Mr. Grohs has alleged sufficient facts to state a claim for retaliation against Yates, and this claim will be permitted to proceed.

It is unclear, however, what role Mailroom Officer Lukaszewski is alleged to have played in the purported retaliation. The primary contention against Lukaszewski is that he "initiated the paper-work which caused Plaintiff's name to be brought before Defendant Yates" and that he "presented facts that either implicated Plaintiff in some wrong-doing or that somehow showed that Plaintiff was involved with the introduction of contraband within the STU." (*Id.* ¶ 94.) This allegation, aside from being vague, does not suggest that Lukaszewski had any retaliatory motive. Indeed, it implies that Lukaszewski, even if allegedly mistaken, believed that Mr. Grohs had been involved in receiving contraband. Furthermore, Mr. Grohs alleges that "[t]he decision to place [him] in TCC was a decision made *solely* by Defendant Yates." (DE 1 ¶ 95 (emphasis added); *see also id.* ¶ 105 ("the decision of Defendants Yates to place Plaintiff in TCC."); ¶ 107 ("Defendant Yates's decision to place Plaintiff in TCC"), ¶ 108 ("Defendant Yates did so because of her having an opportunity to reprise against Plaintiff.").

In short, there is no factual allegation that Lukaszewski played any role in the decision to place Mr. Grohs in TCC, that he had any retaliatory motive, or that he knew of or participated in any scheme to retaliate against Mr. Grohs. Accordingly, the retaliation claim is dismissed as against defendant Lukaszewski.

### b. Unreasonable-Search Claims

The Fourth Amendment of the Constitution of the United States guarantees a right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. Whether a search or seizure is reasonable "'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 618 (1989) (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)). "[T]he permissibility of a particular practice is judge by balancing its intrusions on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 619 (internal quotation marks omitted); *see also Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Factors to consider in determining the reasonableness of a search include "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559. "[T]here is no mechanical way to determine whether intrusions on an inmate's privacy are reasonable." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 327 (2012).

Although involuntarily committed patients and sexually violent predators retain some right to privacy under the Fourth Amendment, it is not equivalent to the right enjoyed by individuals in society generally. *See Serna v. Goodno*, 567 F.3d 944, 948 (8th Cir. 2009); *Allison v. Snyder*, 332 F.3d 1076, 1076–79 (7th Cir. 2003); *Aiken v. Nixon*, 236 F. Supp. 2d 211, 233 (N.D.N.Y. 2002), *aff'd*, 80 F. App'x 146 (2d Cir. 2003). As to civilly committed persons, the Supreme Court has applied the *Bell v. Wolfish* test, which balances a person's Fourth Amendment interests against legitimate governmental interests. *See Youngberg v. Romeo*, 457 U.S. 307, 320–22 (1982) (citing *Bell*, 441 U.S. at 539).

The Supreme Court has repeatedly recognized the difficulty of effectively operating a detention facility. Accordingly, it has counseled deference to correctional officials, concluding that "a regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'" *Florence*, 566 U.S. at 326 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). That principle, however, has its limits. Application of the *Turner* factors "does not categorically uphold all bodily searches in prisons." *Parkell v. Danberg*, 833 F.3d 313, 326 (3d Cir. 2016). The justification for strip searches, for example, is the detection of contraband; it follows that, as the plausible opportunities for a detainee to obtain contraband are eliminated, the legitimate governmental interest in performing a bodily search is correspondingly diminished. *See id.* at 326–28.

### i. Count II

In Count II, Mr. Grohs alleges that Yates, Foley, Rivera, Lee, and Calton violated his Fourth Amendment rights when he was strip searched upon entering TCC on October 27, 2015. (DE 1 ¶¶ 113–127.) He contends that there was no probable cause to justify the search and that he could, instead, have been searched by a "non-[in]vasive electronic device" or by a pat-down. (*Id.* ¶¶ 114–115.) Yates, he explains, developed a written search plan which permitted strip searches "if there is probable cause to believe [that a resident] is [concealing] a weapon or other object that could place staff or Residents at risk," but which also explicitly permitted "[n]on-invasive electronic scanning." (*Id.* ¶¶ 117–118.) Mr. Grohs alleges that Sergeant Rivera, who oversaw the October 2015 search, "failed to apply the directives and adhere to the objectives of the existing Search Plan" and chose to perform a strip search rather than an electronic scan. (*Id.* ¶ 119.)

12

Upon screening, these allegations are sufficient to plead a claim against Rivera and Lee. Mr. Grohs alleges that Sergeant Rivera's decision to perform a strip search violated institutional policy. That claim requires factual development; if for example, there was a basis for individualized suspicion that Mr. Grohs possessed contraband, that could justify the search. *See Parkell*, 883 F.3d at 328–29. It Mr. Grohs is correct, however, that the search violated institutional policy, it might not enjoy the deference given to searches pursuant to institutional policy. *See Florence*, 566 U.S. at 326. Mr. Grohs suggests that Rivera opted for a strip search, not for legitimate reasons, but for the purpose of humiliating him. (DE 1 ¶ 120.) Lee, he alleges, was the officer who actually performed the search. Accordingly, this claim will be permitted to proceed as against Rivera and Lee.

The only allegation regarding Officer Calton, however, was that he was present on the scene. (*See* DE 1 ¶¶ 43, 49.) That does not sufficiently allege Calton's involvement in the search, and the claim will therefore be dismissed without prejudice as against Calton.

Mr. Grohs further alleges that Administrator Yates and Search Plan Coordinator Foley knew that officers were routinely performing strip searches of residents being placed in TCC, because Foley prepared monthly search reports and submitted these to Yates. (DE 1 ¶¶ 121–123.) Mr. Grohs contends that Yates and Foley were deliberately indifferent to the development of this practice, which led to a violation of his constitutional rights. (*Id.* ¶¶ 124–125.)

Supervisory liability generally requires some affirmative conduct by the supervisor, such as a supervisor's implementation or maintenance of a policy, practice, or custom that caused the plaintiff constitutional harm. *Parkell*, 833 F.3d at 330; *Santiago v. Warminster Township*, 629 F.3d 121, 129 n.5 (3d Cir. 2010). There are two potential theories of supervisory liability. Under the first theory, defendants may be sued as policy makers "if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, custom,

or practice which directly caused [the] constitutional harm.'" *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). The second theory of liability provides that a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in subordinates' violations. *See Baker v. Monroe Township*, 50 F.3d 1186, 1190–91 (3d Cir. 1995). Knowledge, for these purposes, means "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents." *C.H. ex. rel. Z.H. v. Oliva*, 226 F.3d 198, 202 (3d Cir. 2000).

In nonprecedential opinions, the Third Circuit has expressed doubt as to whether the knowledge-and-acquiescence subcategory of supervisory liability survived the Supreme Court's decision in *Ashcroft v. Iqbal.* 556 U.S. at 677 ("purpose rather than knowledge is required to impose *Bivens* liability . . . for an official charged with violations arising from his or her superintendent responsibilities."). *See Jones v. Pi Kappa Alpha Int'l Fraternity, Inc.*, No. 17-3272, 2019 WL 1452938, at *6 (3d Cir. Apr. 1, 2019); *Jankowski v. Lellock*, 649 F. App'x 184, 187 (3d Cir. 2016). Because the precise contours of the supervisory liability theory asserted here will not be clear without further factual development, I decline to resolve this legal issue at this, the preliminary screening stage.

The Complaint adequately pleads a claim against Yates and Foley. Mr. Grohs contends at a minimum that they knew that officers had a routinized institutional practice of performing unnecessary strip searches of residents being placed in TCC, which were regularly reported. Accordingly, these claims will be permitted to proceed against Yates and Foley.

In Count III, against Lanigan, Foley, John Doe, and Jane Doe, Mr. Grohs alleges that the June 9, 2016 strip search violated his Fourth Amendment rights. Specifically, he alleges that, during a "stand-up count," Officer John Doe performed an unjustified strip search on him, which included compelling Mr. Grohs to touch his own genitals and subsequently put his fingers in his mouth.[3] This count contains fewer specific factual allegations than Count II—for instance, it is unclear whether this strip search is alleged to have been performed in conformance with, or in violation of, institutional policy. Nonetheless, at this preliminary stage of the action, I will permit this claim to proceed against John Doe, the yet-unidentified primary actor.

I will also permit this claim to proceed against Lanigan, Foley, and Jane Doe under a theory of supervisory liability. Mr. Grohs asserts that they were "present on South housing unit and they were cognizant of the actions of Defendant John Doe, as all other SOG officers were acting in a similar way with other residents," yet they did not take "any action to ensure that Plaintiff was searched in accordance with the provisions of *N.J.A.C.* § 10A:35-4.2(c)." (DE 1 ¶¶ 92, 137.) This is sufficient, upon screening, to state that Commissioner Lanigan, Search Plan Coordinator Foley, and Ombudsman Jane Doe[4] were in charge, had contemporaneous knowledge of the allegedly unconstitutional search, and acquiesced to it, or alternatively that there was a de facto policy. I will permit the claim to proceed against them at this time.[5]

---

[3]     Mr. Grohs also alleges that John Doe hit him in the face and subsequently slammed his face into the ground. I address these allegations in connection with the excessive-force claim, *infra*.

[4]     Mr. Grohs specifically alleges that Ombudsman Jane Doe "is required to ensure that strip searches of residents are to be conducted in a professional and dignified manner, with maximum courtesy and respect for the resident's person, and under sanitary conditions." (DE 1 ¶ 20.) The proceeding of this claim upon screening should not be construed as a legal conclusion that NJDOC ombudsmen will be considered supervisors for misconduct that occurs in their presence.

[5]     I note that Mr. Grohs asserts a separate claim, Count VIII, for supervisory liability related to the strip searches against Lanigan, Yates, Jane Doe, and Foley. (DE 1 ¶¶ 179–189.) This claim will be permitted to proceed insofar as I have found adequately pleaded claims for supervisory liability in the

### iii. Count VII

In Count VII, Mr. Grohs attempts to assert a distinct claim under the Cruel and Unusual Punishment Clause of the Eighth Amendment in relation to the two strip searches. As Mr. Grohs urges elsewhere in his complaint, he is not imprisoned for a criminal conviction; he is civilly committed. The Cruel and Unusual Punishment Clause of the Eighth Amendment applies only to those convicted of a criminal offense. *See Ingraham v. Wright*, 430 U.S. 651, 668–71 & n.40 (1977); *see also DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199 n.6 (1989); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243–44 (1983); *Bell*, 441 U.S. at 535 n.16. Where the Eighth Amendment does not apply to a detainee, such as a pretrial detainee or a person who is civilly committed, the Due Process Clause of the Fourteenth Amendment often grants a similar right to be free of infliction of excessive or inappropriate sanctions. *See City of Revere*, 463 U.S. at 244; *Bell*, 441 U.S. at 535. Thus, where a convicted person would have a claim of cruel and unusual punishment, a detainee may have a parallel due process claim. *See DeShaney*, 489 U.S. at 199; *Youngberg*, 457 U.S. at 315–16; *Bell*, 441 U.S. at 535–36.

This particular claim, however, is superfluous at best. Where, as here, however, the plaintiff's claims already implicate a more definite constitutional right, the "more-specific provision rule" requires analysis of the claim under that right, rather than the substantive Due Process Clause. *See United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (finding that, where "a

---

analysis of the Fourth Amendment claims. I note, however, that, in Count VIII, Grohs also seems to seek to hold Lanigan liable under a supervisory theory for the October 2015 search. The only allegation that Lanigan had a role in that search is an assertion that "[t]he STU Search Plan is submitted to the Office of Defendant Lanigan for review and approval before February 15 of each year." (*Id.* ¶ 185.) Mr. Grohs contends, however, that the October 2015 strip search was in *violation* of institutional search policy. (*Id.* ¶ 119.) Lanigan's knowledge and approval of the Search Plan does not tend to establish any involvement in a search that allegedly did not conform to the Search Plan. The allegation that Lanigan was "aware that residents were being subjected to unreasonable strip searches" is conclusory and without any factual support. Accordingly, to the extent Mr. Grohs seeks to hold Lanigan liable as a supervisor for the October 2015 strip search, that part of the claim is dismissed.

constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process"); *see also Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010). Because Count VII, as pled here, at best is a reframing of the Fourth Amendment claims, it will be dismissed upon screening.

### iv. Count IX

In Count IX, Mr. Grohs alleges that the strip searches ordered by Sergeant Rivera and Officer John Doe also violated his "Common Law Rights under the New Jersey Constitution," particularly Article I, paragraphs 1 and 7. (*See* DE 1 ¶¶ 190–197.) He contends that, as the Supreme Court of New Jersey has found that an involuntarily committed psychiatric patient has an expectation of privacy in his assigned room, that the New Jersey Constitution should similarly protect Mr. Grohs from unjustified strip searches. (*See id.*)

Article I, paragraph 7, of the New Jersey Constitution provides protections very similar to those of the Fourth Amendment.[6] *Compare* U.S. Const. amend. IV *with* N.J. Const. art. I, para. 7. *See also Mollo v. Passaic Valley Sewerage Comm'rs*, 406 F. App'x 664, 668 (3d Cir. 2011). The rights created by the two provisions are frequently applied as coextensive, though the protections under the New Jersey Constitution have occasionally been found to be broader in specific circumstances. *See Mollo*, 406 F. App'x at 668; *N.J. Transit PBA Local 304 v. N.J. Transit Corp.*, 701 A.2d 1243, 1249–51 (N.J. 1997) (applying state and federal provisions together); *State v. Pierce*, 642 A.2d 947, 960 (N.J. 1994) (collecting cases where paragraph 7 protections found broader than Fourth Amendment); *Desilets ex rel. Desilets v. Clearview Reg'l Bd. of*

---

[6]     While Mr. Grohs primarily focuses on paragraph 7, I note that article I, paragraph 1, of the New Jersey Constitution generally provides the same protections as the federal Due Process Clause. *See Farneski v. County of Hunterdon*, 916 F. Supp. 2d 573, 585 n.15 (D.N.J. 2013) (citing *State Farm Mut. Auto. Ins. Co. v. State*, 590 A.2d 191, 199 (N.J. 1991)).

*Educ.*, 627 A.2d 667, 673 (N.J. Super. Ct. App. Div. 1993) (finding, in considering search of school student's bags, "We are not persuaded that the New Jersey Constitution provides greater protection under the circumstances of this case than its federal counterpart.").

I therefore conclude that Mr. Grohs, having pled a Fourth Amendment claim, has also adequately pled a parallel claim against Rivera and John Doe under article I, paragraph 7, of the New Jersey Constitution. Because the New Jersey Constitution is at least as broad as the Fourth Amendment, it supports a claim based on the strip searches. Accordingly, Count IX will be permitted to proceed.

### c. Excessive-Force Claims

A civilly committed person's claim of excessive force claim against institutional officers arises under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment. The standards, however, are generally the same. *See Rivera v. Marcoantonio*, 153 F. App'x 857, 859 n.1 (3d Cir. 2005) (citing *Youngberg*, 457 U.S. at 315–16); *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979). To state a claim for excessive force, a plaintiff must allege plausibly that an official's acts resulted in "unnecessary and wanton infliction of pain." *See Whitley v. Albers*, 475 U.S. 312, 320 (1986). The central question will be "whether force was applied in a good faith effort to maintain order or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 320–21.

In Count IV, Mr. Grohs alleges that Officer John Doe applied excessive force during the June 2016 search. Specifically, Mr. Grohs alleges that, when he asked John Doe whether there was probable cause to search him, John Doe responded by slapping him in the face. Subsequently, Mr. Grohs contends, when a disturbance erupted with another resident, John Doe

suddenly slammed Mr. Grohs to the cement floor while his hands were restrained behind him, preventing him from catching himself or shielding his face. Upon preliminary screening, I conclude that these factual allegations are sufficient to set forth a claim that John Doe used force maliciously to inflict unnecessary pain on Mr. Grohs.

Count IV will therefore be permitted to proceed past screening.

### d. Abuse-of-Power Claims

In Count V, Mr. Grohs alleges that Commissioner Lanigan, Administrator Yates, Search Plan Coordinator Foley, Sergeant Rivera, Officer Lee, Officer Calton, Ombudsman Jane Doe, and Officer John Doe, violated his Fourteenth Amendment rights via "abuse of power." (*See* DE 1 ¶¶ 150–164.) The gist of this claim is that these defendants, by treating Mr. Grohs as if he were a convicted prisoner, rather than a civilly committed detainee, violated his due-process rights. (*See id.*) No particular factual allegations are related in connection with this claim.

These allegations are too broad and general to state a plausible claim. To the extent that its factual basis can be inferred, Count V is a catchall description of the other claims alleged elsewhere in the Complaint, and is superfluous. Mr. Grohs does not identify any specific deprivation of procedural due process. To the extent that he attempts to plead a substantive due-process claim, such an attempt is barred by the "more-specific provision" rule, already discussed herein. *See Lanier*, 520 U.S. at 272 n.7.

Accordingly, Count V is dismissed upon screening.

### e. Conditions-of-Confinement Claims

A conditions-of-confinement claim by a civilly committed person arises under the Fourteenth Amendment. *See Youngberg*, 457 U.S. at 324–25; *Davis v. Yates*, No. 15-6943, 2016 WL 5508809, at *5 (D.N.J. Sept. 27, 2016); *Artis v. McCann*, No. 11-3613, 2013 WL 2481251,

at *3 (D.N.J. June 10, 2013). The Fourteenth Amendment protects committed persons from

being subjected to conditions that are punitive or outside the bounds of professional discretion.

*See Youngberg*, 457 U.S. at 321–22; *Bell*, 441 U.S. at 536. The central question is, thus, whether

the conditions imposed on a committed person cross the line separating proper institutional

administration from punishment.

> A court must decide whether the disability is imposed for the
> purpose of punishment or whether it is but an incident of some
> other legitimate governmental purpose. Absent a showing of an
> expressed intent to punish on the part of the detention facility
> officials, that determination generally will turn on whether an
> alternative purpose to which the restriction may rationally be
> connected is assignable for it, and whether it appears excessive in
> relation to the alternative purpose assigned to it. Thus, if a
> particular condition or restriction of pretrial detention is reasonably
> related to a legitimate governmental objective, it does not, without
> more, amount to "punishment." Conversely, if a restriction or
> condition is not reasonably related to a legitimate goal—if it is
> arbitrary or purposeless—a court may permissibly infer that the
> purpose of the governmental action is punishment that may not be
> constitutionally inflicted . . . .

*Bell*, 441 U.S. at 538–39 (internal quotation marks, brackets, citations, and footnotes omitted);

*see also Hubbard v. Taylor*, 399 F.3d 150, 158 (3d Cir. 2005) [hereinafter *Hubbard I*]; *Hubbard*

*v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008) [hereinafter *Hubbard II*].

Only a deprivation that is both serious and intentional will be treated as punishment:

> Unconstitutional punishment typically includes both objective and
> subjective components. As the Supreme Court explained in *Wilson*
> *v. Seiter*, the objective component requires an inquiry into whether
> "the deprivation [was] sufficiently serious" and the subjective
> component asks whether "the officials act[ed] with a sufficiently
> culpable state of mind." The Supreme Court did not abandon this
> bipartite analysis in *Bell*, but rather allowed for an inference of
> mens rea where the restriction is arbitrary or purposeless, or where
> the restriction is excessive, even if it would accomplish a
> legitimate governmental objective.

*Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007) (citations omitted; alterations in original); *see also Wilson v. Seiter*, 501 U.S. 294, 298 (1991). As to the objective component, courts must consider "whether these conditions cause inmates to endure such genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them." *Hubbard II*, 538 F.3d at 233 (internal quotation marks and citations omitted). The analysis must encompass the totality of the circumstances within an institution. *See id.*

Detainees "have a right to adequate ventilation and a right to be free from extreme hot and cold temperatures, but the Constitution does not give inmates the right to be free from all discomfort." *Kates v. Bledsoe*, No. 11-391, 2013 WL 4417656, at *8 (M.D. Pa. Aug. 14, 2013) (internal quotation marks and alterations omitted), *aff'd*, 547 F. App'x 93 (3d Cir. 2013); *see also Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013); *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010); *Jones-El v. Berge*, 374 F.3d 541, 543–45 (7th Cir. 2004); *Chandler v. Crosby*, 379 F.3d 1278, 1294 (11th Cir. 2004). Unsanitary conditions can also be so severe as to result in a constitutional violation. *See Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992), *superseded by statute on other grounds*, Prison Litigation Reform Act of 1996, Pub. L. No. 104–134, 110 Stat. 1321. To show deliberate indifference, an institutional official must both know of and disregard an excessive risk to an inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

In Count VI, Mr. Grohs alleges that Administrator Yates failed to ensure that he was not subjected to cruel and unusual conditions of confinement. Particularly, he contends that his TCC cell was excessively heated and reached temperatures over 109 degrees. (DE 1 ¶ 167.) He also alleges that the cell was filthy, with various surfaces covered in human waste, that it lacked

potable water, and that it was infested by bedbugs. (*Id.* ¶¶ 55–57, 63, 65, 70, 171.) He asserts that the excessive temperatures in this area of the facility were a longstanding problem and that an officer told him that "the administration was aware of the problem." (*Id.* ¶ 62.)

These allegations are sufficient to state a conditions-of-confinement claim against Yates. Mr. Grohs was only subjected to such circumstances for around 39 hours, and refers to no medical consequences, so any damages would presumably not be great even if the claim were proven. Still, the extreme heat combined with lack of potable water, as well as the generally unsanitary conditions, are sufficient to plead hazards to Mr. Grohs's health and safety resulting from a deliberate indifference as to whether conditions were punitive or served any institutional purpose.

Accordingly, Count VI claim will be permitted to proceed past screening.

## V.     CONCLUSION

For the foregoing reasons, upon screening under 28 U.S.C. § 1915(e)(2)(B), the following claims are dismissed without prejudice for failure to state a claim: (1) the First Amendment retaliation claim in Count I as against Lukaszewski only; (2) the Fourth Amendment unlawful search claim in Count II as against Calton only; (3) the abuse-of-power or due-process claim in Count V; (4) the Eighth Amendment claim in Count VII; and (5) the supervisory liability claim in Count VIII insofar as it concerns the events of October 27, 2015, against Lanigan only. The remainder of the complaint will be permitted to proceed at this time. An appropriate order follows.

DATED: April 5, 2019

KEVIN MCNULTY
United States District Judge

22